MEMORANDUM OF DECISION
GUERNSEY, C.J.
Claimant William C. Burnett, II appeals from the decision of the Mohegan Tribal Workers Compensation Trial Commissioner’s Finding of Facts, Award in Part/Dismissal in Part dated August 9, 2012, focusing primarily on the Trial Commissioner’s Findings regarding laparoscopic gastric band surgery that Claimant underwent prior to the performance of his latest lumbar spinal surgery. Claimant also challenges the Trial Commissioner’s refusal to award attorney’s fees, as well as a limitation placed on future “post-specific” disability benefits. Inasmuch as a determination of these issues in this case is intensely fact-based, review of the extensive eviden-tiary record is essential.[1]
I
FACTUAL BACKGROUND
As documented by the Trial Commissioner, Claimant has been a large and heavily muscled individual for a long period of time, weighing 293 pounds when first hired as a table games dealer for Mohegan Sun in May, 1993. His employment with Respondent Mohegan Tribal Gaming Authority (MTGA) lasted until December 23, 2006, during which time he suffered two compensable injuries arising out of and in the course of his employment. In the first, on May 11, 2003, he slipped and fell on a wet surface and developed low back pain, which eventually led to a diagnosis of a herniated disc at L5-S1 on the right with nerve root compression. For this he underwent a right-sided hemilaminectomy and disc excision, performed by Dr. Michael Halperin of Norwich Orthopedic Group on August 18, 2003. His weight at the time was 328 pounds according to hospital records. Although he returned to full duty on December 4, 2003, he soon suffered a recurrence of severe pain, which resulted in Dr. Halperin performing a repeat right-sided L5-S1 discectomy on March 4, 2004. Hospital records at that time indicated his weight was 339 pounds. On October 26, 2004 Dr. Halperin ascribed a 15% impairment of the lumbar spine as a result of the May 11, 2003 injury.
The second compensable injury, and the subject of the instant appeal, occurred on May 1, 2005 while Claimant was attempting to step over a velvet rope and was bumped by a patron, causing him to slip and jar his back. This claim was accepted by Respondent, and Claimant’s medical care was again provided by physicians associated with Norwich Orthopedic Group, P.C. (Drs. Pasha, Halperin and Abella). Treatment included a right SI transfora-minal epidural steroid injection on September 6, 2005, and lumbar discography on *247 October 21, 2005 to determine the feasibility of further surgery, An LS-Sl discecto-my and fusion was performed on January 1, 2006 by Dr. Halperin. Hospital records at that time indicated Claimant’s weight was 335 to 341 pounds. Unfortunately, the complications at the two levels above the fusion predicted by Dr. Jeffrey B. Steckler in an independent medical examination and medical records review on April 17, 2006 were confirmed by an MRI on October 10, 2006. On February 2, 2007 Claimant was assigned a 27% impairment of the lumbar spine by Dr. Halperin, who attributed 15% of this to preexisting conditions, leading the Trial Commissioner to conclude an impairment of 12% of the lumbar spine was attributable to the May 1, 2005 injury,[2] Permanent partial disability benefits for the 12% impairment were paid by Respondent (44.88 weeks) pursuant to MTC § 4-232(d).
Continued left sided sciatic pain led to a caudal epidural steroid injection on November 8, 2007 and a left-sided L4-5 hemi-laminectomy and disc excision (and related procedures) on March 13, 2008 by Dr. Halperin. Hospital records show Claimant’s weight at the time to be 341 to 346 pounds. Although Claimant continued to suffer left-sided sciatica, he was released for light duty on May 26, 2008, leading to the approval of a Form M36 for a May 26, 2008 and release to light duty with job searches. An EMG on May 28, 2008 suggested left acute L4 radiculopathy, with Claimant’s weight reported as 335 pounds. On June 8, 2008 Dr. Halperin reeom-mended both L4 and L3 transforaminal epidural steroid injections prior to surgery. These were performed by Dr. Abel-la on June 23, 2008 and July 7, 2008 and provided only transient pain relief.
II
THE WEIGHT ISSUE
Concern over Claimant’s weight as a surgical factor apparently commenced on September 28, 2005 with a discussion of weight loss with Dr. Halperin. Later, Dr. Philo F. Willets, Jr., in a second independent medical examination and records review performed January 9, 2008, noted claimant’s “massive obesity” but stated that it was only a minor contributor to his injuries and need for surgery. At the time of the June 8, 2008 examination, Dr. Halperin noted that he was reluctant to perform surgery due to Claimant’s “large size” and past surgeries. By July 22, 2008 Dr. Halperin was recommending conservative treatment rather than surgery due to Claimant’s size, but relented due to Claimant’s wishes and scheduled him for an L3-4 extraforaminal discectomy, which he later decided against performing over doubts as to its effectiveness in providing pain relief.[3] After further discography performed by Dr. Abella, on October 29, 2008 Dr. Halperin noted that “surgery was tentatively possible, but since he is at risk for complications, if the Claimant could lose more weight, that would make things more ideal.”[4] Claimant’s weight was 340 *248 pounds and he was to return after discussing weight loss with his primary care physician. Upon returning to Dr. Halperin on December 30, 2008, having been unsuccessful at losing weight, Claimant raised the issue of lap band surgery, which was endorsed by Dr. Halperin, whose office note reads as follows:
HISTORY: The patient returns today. We discussed his possible surgery in the lower back. He is still overweight, and is having great difficulty losing weight despite trying,
RECOMMENDATION: He has met with a doctor regarding the possibility of lap band surgery for weight control. I would completely endorse this. I think that the patient desperately needs to lose weight, and if he cannot do it on his own, if it could be accomplished surgically, I think that it would certainly be beneficial for his lower back. Certainly, if he needed surgery on his back, if he could lose weight, this would make the surgery technically much easier to accomplish. The patient is what I would consider to be a surgical nightmare at this point because he is just so large and muscular, he has had prior surgery and has scarring, and it would be a very difficult surgery to accomplish, given the current circumstances.
Record at 42, Office notes of Norwich Orthopedic Group, P.C. 12/20/2008.
When next seen by Dr. Halperin on April 1, 2009, Claimant related that he may “possibly” be undergoing lap band surgery within the next few weeks. Dr. Halperin’s office note reads as follows:
RECOMMENDATION: At this point I would defer any surgical considerations until after Mr. Burnett has his lap band surgery. Not only do we have to wait for him to have lap band surgery, but we also have to wait for the results of the surgery, and that may take months.... I explained that I would not recommend doing anything surgically before his lap band surgery because he is a high surgical risk for complication at this point. I certainly would much rather operate on him when I think that there is a chance that we could do a safer and more effective procedure.
Record at 42, Office notes of Norwich Orthopedic Group, P.C. 04/01/2009. Respondent’s Form M 36 dated April 17, 2009 claiming that “inability to have back surgery is not related to work” was denied by Chief Commissioner Rossi.
A Commissioner’s Examination on June 9, 2009 by Dr. Enzo Sella concluded that given Claimant’s obesity and prior surgeries, further surgery should be a last resort, and that the causative factors of Claimant’s medical condition were the May 1, 2005 injury, his pre-existing lumbar pathology and his exogenous obesity. Dr. Sella found Claimant capable of light duty.
On June 11, 2009, with his weight at 363 pounds, Claimant underwent laparoscopic placement of an adjustable gastric band and repair of hiatal hernia at Hartford Hospital. As of the date of surgery, Claimant had been on temporary partial disability, and Respondent’s Form M 36, filed on August 28, 2009 claiming “present disability is not related to injury of May 1, 2005,” was denied by Chief Commissioner Rossi, as were subsequent Forms M 36 dated September 3, 2009, September 4, 2009, and October 19, 2009.[5] According to the deposition testimony of Dr. Sella, Claimant’s obesity was a complication to *249 further surgery but not causative of the L3-4 disc herniation that necessitated it. Respondent’s Form M 86 dated January 29, 2010 was granted in part on grounds that at his deposition Dr. Halperin testified that he never ordered the Claimant to lose weight before he would perform surgery.[6]
Claimant’s first visit to Dr. Halperin following the June 11, 2009 laparoscopic gastric band placement occurred on February 11, 2010, at which time his weight was 830 pounds. At that time Dr. Halpe-rin observed:
[o]nee again for now I think that he still needs to lose weight.... He still is grossly overweight and surgery could be more safely accomplished if we can get his weight down a little bit ... If he is losing weight [in 2 months] then we will *250 consider an MRI of the lumbar spine in anticipation for possible surgery.[7]
His duty status was “able to work with restrictions.” Record at 42, Office notes of Norwich Orthopedic Group, P.C. 02/11/2010. There is, however, some inaccuracy or confusion in Dr. Halperin’s notes, which relate that the lap band surgery was “done 2-3 months ago” and that “he reports that it could take 8-10 months for him to get down to his peak weight loss,” when in fact the lap band surgery actually was 8 months before this office visit. Whether this inaccuracy resulted from a misunderstanding on the part of Dr. Halperin or some fudging on the part of Claimant as a result of his slow progress [8] was never established.
By April 9, 2010, Claimant was down to 318 pounds, but Dr. Halperin still advised Claimant:
My suggestion to William is to hold off on any surgical considerations. His current weight is 318 pounds and he is 61", putting him at a body mass index of 42. Any surgery would be very difficult to accomplish on Mr. Burnett, and he would certainly be at a high risk because of his size and history of previous surgery.
Claimant’s duty status was “able to work with restrictions.” Record, at 42, Office notes of Norwich Orthopedic Group, P.C. 04/09/2010. When seen by Dr. Pasha three days later, it was noted that Claimant was maintained on narcotic pain medication and his duty status was “light duty with restriction” and that he “still has significant back pain which radiates to the lower extremities and flares up with standing, walking and physical activity. Record at 42, Office notes of Norwich Orthopedic Group, P.C. 04/12/2010. On July 12, 2010 Dr. Pasha noted Claimant’s status as “post lap band” and his duty status as “light duty with restrictions”.
In a letter to the Trial Commissioner dated August 25, 2010, Dr. Halperin stated:
I have been delaying booking Mr. Burnett for surgery because he has been attempting to lose weight. Certainly the more weight that he can lose, the more feasible surgery can be,
[[Image here]]
It is my recommendation for Mr. Burnett, if he absolutely cannot live with his pain, that we proceed with L3-4 and L4-5 decompression and fusion. This can be done at any time at this point.
Record at 41, Letter from Dr. Halperin to Commissioner Pacelli, August 25, 2010.
Claimant returned to Dr. Halperin on September 29, 2010, to discuss surgery, with continued complaints of back pain, stating that he was at the point that “he cannot live with his pain any longer” and wished to proceed with surgery. Dr. Halperin’s note indicated that he would recommend performing L3~4 and L4-5 laminectomy and TLIF/TPSF[9]. At this *251 time his duty status was noted to be “working.” At the follow-up on December 7, 2010, Dr. Halperin noted:
He is a big man and not easy to operate on. Even though he did lose weight, we still will have a challenge at surgery, therefore, he is at some risk, due to his weight, for increased complications....
His duty status at the time was again noted to be “working,” Record at 42, Office notes of Norwich Orthopedic Group, P.C. 12/07/2010. This notation did not factor in the Trial Commissioner’s award of temporary partial disability benefits and has not been addressed on appeal.
The surgery was carried out at William W. Backus Hospital on January 3, 2011. The Operative Report makes note of the fact that, due to the patient being very large and having undergone prior surgery, there was increased difficulty and length of time needed “to do the surgery properly.” Record at 44, Operative Report, William W. Backus Hospital, 01/03/2011. Subsequent office notes from Dr. Halperin describe Claimant as totally disabled until March 22, 2011, when his status was changed to “disabled but able to return to light work within the next few weeks.” By August 2, 2011, his status was “able to do light work,” and by October 4, 2011, it was “able to -work.”
Ill
TRIAL COMMISSIONER’S FINDINGS AND AWARDS
Based on the foregoing, the Trial Commissioner made findings and awards that may be summarized as follows:
1.The June 11, 2009 laparoscopic placement of a gastric band was not the responsibility of Respondent;
2. Claimant was ineligible for disability benefits from June 11, 2009 (the date of the lap band surgery) through August 24, 2010 (the day preceding Dr. Halpe-rin’s letter to Commissioner Pacelli);
3. Temporary partial disability benefits were awarded from August 25, 2010 through January 2, 2011 (the day preceding the L3-4 and L4-5 fusion), with a credit for any payments made during the preceding period of ineligibility);
4. Temporary total disability benefits were awarded following the January 3, 2011 surgery until April 5, 2011 (in accordance With the March 22, 2011 office note from Dr. Halperin predicting light duty capability “within the next few weeks”);
5. Temporary partial disability benefits thereafter (April 6, 2011) were awarded through October 4, 2011, when Claimant was rated “able to work.”
In addition, the Trial Commissioner found that Respondent’s failure to reinstate disability benefits for the August 25, 2010 through October 2, 2011 without prior approval was contrary to the Commissioner’s order, and awarded interest at the rate of 10% per annum pursuant to MTC § 4-206, but not attorneys fees.
The Trial Commissioner also entered one prospective award and one limitation of a prospective award, which can be summarized as follows:
1. An award of additional permanent partial disability benefits[10] which are causally related to the May 1, 2005 work injury, once maximum medical improvement was reached. The Commissioner’s Articulation specified “any permanent partial disability benefits ascribed to the *252 Claimant’s lumbar spine which are in addition to the 27% impairment rating of Claimant’s lumbar spine previously ascribed by Dr. Michael Halperin and paid by Respondent ..[11]
2.Additional discretionary benefits (i.e., “post-specific” benefits) pursuant to MTC § 4-233 were limited in duration to the duration of permanent partial disability benefits paid under MTC § 4-232; the Trial Commissioner’s Articulation made clear that this the duration of benefits paid for Claimant’s first (May 11, 2003) injury while in the employment of Respondent was not to be included in determining the maximum period of § 4-233 benefits.
IV
ISSUES RAISED ON APPEAL
In his appeal, Claimant challenges the following aspects of the Trial Commissioner’s Finding and Award:
1. Although Claimant’s weight was unrelated to his work injury, the treatment for it was not and the treatment for his obesity was compensable;
2. The interruption of temporary partial disability benefits as a result of the laparoscopic gastric band surgery on June 11, 2009, either on the basis that the same should have been converted to temporary total disability benefits following the gastric band surgery, or that the evidence did not support a finding that Claimant was disqualified from receiving temporary partial disability benefits;
3. The Trial Commissioner should not have ruled prospectively on post-specific benefits pursuant to MTC § 4-233, or in the alternative, placed an improper limitation on yet to be awarded post-specific benefits;
4. The Trial Commissioner improperly failed to impose sanctions, including attorneys fees, on the Respondent.
STANDARD OF REVIEW
Pursuant to MTC § 4-207, in the absence of a motion for leave to present additional evidence, an appeal to The Mohegan Court is confined to the record, and the Court “shall not substitute its judgment for that of The Mohegan Workers’ Compensation Commission as to the weight of the evidence on questions of fact,” MTC § 4~207(g). As in the State system, there is no de novo review of the issues and evidence.[12] As the Connecticut Appellate Court has noted:
‘The principles that govern our standard of review in workers’ compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinated facts or from an inference illegally or unreasonably drawn from them.... Neither the review board nor this court has the power to retry facts ...’
Dengler v. Special Attention Health Services, Inc., Et Al., 62 ConnApp. 440, 445, 774 A.2d 992 (2001), quoting Schiano v. Bliss Exterminating Co., 57 Conn.App. 406, 411, 750 A,2d 1098 (2000). At the *253 Compensation Review Board level, this standard is set forth in § 31-308-8.[13]
V
DISCUSSION
A
CLAIMANT’S GASTRIC BAND SURGERY
The Trial Commissioner’s finding that Claimant’s obesity was a long-standing pre-existing condition unrelated to his employment is not challenged in this appeal, Nevertheless, Claimant argues that the treatment of his obesity was medically reasonable and a necessary pre-surgieal regimen, citing Vannoy-Joseph v, State of Connecticut, No. 5416 CRB-8-09-1, Expressed somewhat differently, Claimant’s position is that treatment which ameliorates a condition that precludes the injured worker from receiving compensable treatment[14] falls within the judicial interpretation of reasonable or necessary medical care as set forth in Conn. Gen.Stat. § 31—294d(l) and MTC § 4~194(a). As the Compensation Review Board held:
Our Workers Compensation Act requires that a respondent provide medical care that is reasonable or necessary. Section 31-294d. Whether the medical care is reasonable or necessary is a factual finding to be determined by the trial commissioner.
[[Image here]]
[In Chimblo v. Connecticut Light & Power, 5417 CB-7-09-1] [w]e concluded that the trial commissioner’s authorization was an approval of the surgery contingent upon certain events relating to the claimant’s fitness as a surgical candidate generally. We think the instant matter is analogous. At the time that the surgical procedure suggested by Dr. Yue is undertaken, the claimant will need to follow whatever pre-surgery regimen is prescribed by Dr. Yue. Dr. Yue will then evaluate the claimant’s medical fitness to undergo the disc replacement surgery.
Vannoy-Joseph v. State of Connecticut, No. 5416 CRB-8-09-1, 2010 WL 1649308 (March 3, 2010).
On this issue, however, the medical evidence before the Trial Commissioner, described earlier in this opinion, is extensive and somewhat inconsistent. Dr. Halperin testified quite clearly that he did not prescribe the laparoscopic gastric band surgery and did not refuse to perform the L3~4 and L4-5 fusion without it. Just as clear, however, is his (and everyone else’s) preference that the Claimant lose weight prior to the performance of spinal surgery, and his belief that substantial weight loss by the Claimant would make the surgery safer, easier, and increase the likelihood of a successful result.
*254 In light of this, the Trial Commissioner found that Dr, Halperin emphatically testified in his deposition that despite the Claimant’s belief, he did not recommend the Claimant undergo a lap band procedure nor did he refuse to perform further surgery on the Claimant because of his weight,[15] and that [wjhile all physicians consulted regarding the Claimant’s treatment felt it medically desirable that Claimant lose a significant amount of weight, no physician rendered an opinion that it was medically necessary that Claimant lose a significant amount of weight as a condition precedent to surgery. This Finding, however is arguably inconsistent with the report of Dr. Enzo J. Bella’s Commissioner’s Examination of the Claimant dated June 9, 2009, two days before the gastric band surgery. On the issue of holding off further surgery until Claimant was able to lose weight, Dr. Sella’s opinion was quite specific:
The patient does have objective pathological findings in the lumbar spine at L3-4 and L4-5. However, given his mediocre response to previous surgical treatment and the fact that he is significantly obese, I believe that further surgery should be a very last resort and only in cases (sic) where the patient could not live with his symptoms and I would certainly agree with Dr. Halperin that the patient must continue to lose significant amount of weight, probably another 50 lbs. before considering further surgery.
Record at 83, Report of Commissioner’s Examination, Dr. Enzo J. Sella, June 9, 2009 (emphasis added).[16] Nevertheless, the Trial Commissioner was not bound to accept the results of a Commissioner’s Examination, or even to interpret it as requiring weight loss before further surgery, and Dr. Halperiris deposition testimony certainly satisfies the any evidence standard of review as far as Finding (T)’s conclusion that Dr. Halperin did not refuse to perform the L3-4 and L4-5 fusions without Claimant attempting surgical weight loss.[17] Nevertheless, Dr. Halperin was at the very least extremely reluctant to perform surgery without further weight loss.[18] With respect to Dr. Halperiris treatment subsequent to the gastric band surgery, the Trial Commissioner concluded that Dr. Halperin delayed making a decision on further surgery on the Claimant, pending the results of his weight loss which required a considerable amount of time and found that Claimant was ineligible to receive disability benefits commencing with the gastric band surgery until Dr. Halperiris letter to the Commissioner of August 25, 2010.[19] That Dr. Halperin waited to see the results of the gastric band surgery is clear; why this should result in the termination of temporary par *255 tial disability benefits until the August 25, 2011 letter is not.
The Trial Commissioner’s conclusion that lap band was not a necessary medical expense is adequately supported by the evidence and Dr. Halperin’s deposition testimony; that it was not a reasonable medical expense is a much closer question. The evidence clearly establishes that every physician thought weight loss by the Claimant was highly desirable, and that gastric band surgery was one method of attempting this, in light of the lack of success on the part of Claimant in losing weight on his own. Nevertheless, the Trial Commissioner made careful note of the various weights of the Claimant during his other surgeries and concluded that the eventual surgical weight of 300 pounds, essentially 10% less than his weight at the time of his 2006 surgery, supported the dismissal of the claim for the gastric band surgery as reasonable or necessary.[20] As the Compensation Review Board has held, the decision of the Trial Commissioner is entitled to great deference:
In matters such as these, it was up to the trial commissioner to determine which (if any) of the physicians who examined the claimant provided the most reliable testimony or documentary evidence (citations omitted). In doing so, the trier was entitled to accept all, part or none of any given doctor’s medical opinion. This board does not have the power to disturb such a finding on appeal, unless the facts found are without any support in the evidence. Fair v. People’s Savings Bank, 207 Conn. 535, 539, 542 A.2d 1118 (1988).
Callinan v. State of Connecticut, Case No 5583 CB-8-10-7, 2011 WL 7574432 (December 8, 2011), quoting Chamgagne v. O.Z. Gedney, 4425 CRB-5-01-8 (May 16, 2001).
Supporting the Trial Commissioner’s dismissal of the claim that the laparoscopic gastric band surgery was compensable, is the following testimony of Dr. Halperin:
Q, Have you ever told or discussed with [Claimant] that if he loses enough weight he may not have any back pain? A. Well, we’ve always discussed the weight loss. But you have to realize that, I think it’s a lay misconception that losing weight is going to take away back pain. There are benefits to it. But I think that’s—it’s unlikely that that’s going to cure all his problems. Certainly I think it’s to his benefit and I wouldn’t argue that at all. But I don’t think that it’s going to, with someone who has got chronic back issues, that losing the weight is going to make them cured. Maybe there might be some benefit to it though.
Transcript of Deposition of Dr. Michael Halperin, November 18, 2009 at 29. As for the necessity of Claimant losing weight, Dr. Halperin testified:
Q. Did you, in fact, recommend to Mr. Burnett that he have the lap-band procedure performed?
A. Oh, I don’t know. I think he was going to do that on his own.
Q, Did you concur that that was medically appropriate given his problems with his back and need to lose weight? A, Well, I think it’s—I think he could very well lose a lot of weight. I mean, he’s 351 pounds. He needs to lose weight for lots of reasons, not just his back.
Transcript of Continued Deposition of Dr. Michael Halperin, January 26, 2010 at 60-61,
*256 It was therefore within the discretion of the Trial Commissioner to conclude that, based on the conflicting medical evidence[21], the laparoscopic gastric band placement was not a reasonable medical procedure related to his work-related iiy'ury, even though a contrary conclusion would also be permissible and possibly even more in keeping with the weight of the evidence.[22]
B.
TERMINATION OF TEMPORARY PARTIAL BENEFITS
The termination of temporary partial benefits as of the date of the performance of the gastric band surgery and continuing this denial until the letter from Dr. Halperm to the Trial Commissioner, however, is more problematic. Although it is assumed that the laparoscopic gastric band placement resulted in a brief period of ineligibility for temporary partial benefits (owing the Claimant’s presumed inability to be ready and willing to perform other work in the same locality immediately following the surgery), the Record is devoid of evidence in support of this, or upon which any such period of supposed disability could be determined.[23] In any event, by time of Claimant’s first post-gastric band visit to Dr. Halperin on February 11, 2010, it was clear that his light duty status was related to his back pain.[24]
The Trial Commissioner’s denial of temporary partial benefits during this period of time appears to be based on the decision by Dr. Halperin to delay the L3~4 and L4-5 fusions while the effectiveness of the gastric band surgery to reduce Claimant’s weight was evaluated. Inasmuch as prior to the gastric band surgery Claimant was eligible for temporary partial disability benefits while Dr. Halperin encouraged him to lose weight, it is hard to see why a firm step in that direction, the laparoscopic gastric band surgery, would terminate such eligibility. All medical evidence before the Trial Commissioner established that evaluating any resulting weight loss on Claimant’s condition, once the surgery was performed, was at the least medically reasonable, even if not necessary. By the *257 time of his first deposition on November 18, 2009, it was indisputable that any delay by Dr, Halperin was related to his treatment of Claimant’s back pain:
Q. So at this time, just if I understand, at this time there is no surgery planned?
A. At this time it’s wait and see. We’ll see how he does after his lap band. See if there’s any improvement. If not, then he’s probably going to need a whole new workup if he’s at the point where he cannot live with his pain, if he feels that he, you know, has to look into some surgical options. I mean, dearly we could try other conservative things again. And that’s usually the approach that we take. But assuming that those are exhausted and they’re ineffective then we could look into surgical options.
Transcript of Deposition of Dr. Michael Halperin, November 18, 2009 at 32. As for the beneficial effect of weight loss on the upcoming L3~4 and L4-5 fusions, Dr. Halperin testified:
Q. My question was whether or not you would concur that it was medically appropriate for him to lose weight because of the problems in his spine and the proposed surgery?
A. Well, it would definitely make surgery easier, safer, and also technically— you could probably do technically a better job if he’s thinner.
Transcript of Continued Deposition of Dr. Michael Halperin, January 26, 2010 at 60-61.
Although doubtful that weight loss alone could eliminate Claimant’s back pain,[25] Dr. Halperin clearly hoped that allowing Claimant to lose weight would increase the chances for a safe, successful, and technically superior result. In other words, even in light of the Trial Commissioner’s Finding that the gastric band surgery was not compensable, after it was performed there is no evidence supporting either the period of time that Claimant was found to be ineligible for temporary partial disability benefits, or that Dr. Halperin’s decision to evaluate its effect on Claimant’s weight before proceeding with a surgical workup was anything but medically reasonable.
The Trial Commissioner properly references the considerable amount of time that the weight loss required.[26] Indeed, the evidence before the Commissioner showed that at the time of the lap band surgery on June 11, 2009 Claimant’s weight was 363 pounds; by November 4, 2009 it was 331 pounds, but thereafter plateaued, so that by the time Claimant consulted Dr. Halpe-rin on February 11, 2010, he had lost only one additional pound. It was only after the February 11, 2010 office visit, at which the issue of surgical intervention was discussed, that Claimant again began to lose weight, losing an additional 12 pounds by the time of his April 9, 2010 office visit.
*258 Thus, while there is nothing in the record to support the termination of temporary partial disability benefits immediately following the lap band surgery, evidence does support the Trial Commissioner’s dismissal of the same as of November 4, 2009, at which point Claimant was not pursuing to any effect his weight loss strategy and his weight had plateaued at 331 pounds. The Trial Commissioner chose August 25, 2010, the date of Dr. Halperin’s letter to the Commissioner, for the resumption of temporary partial disability benefits, apparently based on Dr. Halperin’s statement that I have been delaying booking Mr. Burnett for surgery because he has been attempting to lose weight and his opinion that the L3-4 and L4-5 fusions can be done at any time.
Nevertheless, all of the medical evidence before the Trial Commissioner establishes that, once the laparoscopic gastric band surgery had been performed, it was medically reasonable to evaluate the resulting weight loss as part of the appropriate treatment of Claimant’s back injury. By the time of the April 9, 2010 office visit and Claimant’s documented resumption of weight loss, this was clearly Dr. Halperin’s medical judgment. It was certainly within the Trial Commissioner’s discretion not to resume temporary partial disability benefits until such time as Claimant actually had resumed the recommended efforts at weight loss, which the medical evidence establishes as April 9, 2010.
With respect to the challenged denial of temporary partial disability benefits following the June 11, 2009 laparoscopic gastric band surgery, Paragraph (U) of the Finding of Facts, Award in Part/Dismissal in Part is reversed solely with respect to the denial of temporary partial benefits commencing June 11, 2009, and the Claimant is awarded temporary partial disability benefits pursuant to MTC § 4-232 commencing June 11, 2009 and terminating November 3, 2009. The Trial Commissioner’s Order resuming temporary partial benefits is affirmed except to the extent that such benefits shall resume on April 9, 2010 rather than August 25, 2010.
C
POST SPECIFIC DISABILITY BENEFITS
Claimant also challenges the Trial Commissioner’s prospective ruling regarding post-specific benefits under MTC § 4-233, the Mohegan Workers Compensation Act’s counterpart to Conn. Gen.Stat. § 31-308a. At issue is the limitation of the award of such post-specific benefits to the period of time benefits were paid under MTC § 4-232 (i.e., specific compensation) in the situation where a prior injury contributed substantially to a claimant’s present disability. In Pizzuto v. Commissioner of Mental Retardation, Et Al., 283 Conn. 257, 927 A.2d 811, (2007), the Connecticut Supreme Court held:
Given, however, the equitable purpose of § 31-308a benefits and the board’s case law considering successive injuries when rendering § 31-308» awards, we conclude that, when a prior disability is a substantial cause of the loss of earning capacity that a claimant suffers after a second disability, the commissioner may consider both disability awards in determining entitlement to and duration of a § 31-308a award.
Id. at 280, 927 A.2d 811. In the context of this case, Claimant had received specific compensation for his (prior) May 11, 2003 injury rated at 15% of the lumbar spine, payable under Conn. Gen.Stat. § 31-308, the law governing workers compensation benefits for MTGA employees at the time, which was subsequently replaced by the Mohegan Workers Compensation Act, *259 whose comparable provision is MTC § 4-232. Claimant was paid additional specific compensation benefits under MTC § 4-232 for this injury equal to 12% of the lumbar spine.
At issue, therefore, is whether to apply the Pizzuto holding that the prior disability could be considered by the Trial Commissioner in determining the duration of post-specific disability benefits when the specific compensation benefits were paid, not under MTC § 4-232, but under its virtually identical State counterpart, Conn. Gen.Stat. § 31-308. As clarified by his Articulation dated January 10, 2013, the Trial Commissioner adopted a quite literal reading of MTC § 4-233:
Mohegan Workers Compensation Law § 4-233 specifically speaks to the Commission’s discretion to award additional compensation benefits for partial permanent disability after such payments provided by § 4-232 has been paid for the period set forth in said section. Thus, the plain unambiguous language of said statute does not allow the Commissioner to consider in its durational limitation permanent partial disability benefits paid to the Claimant under Conn. General Statutes 31—308(b) of the State of Connecticut Workers Compensation Act for Claimant’s 2003 lumbar spine injury.
Commissioner* Response Relative to Claimant’s Motion For Articulation, January 10, 2013, Paragraph 2.
Although the Trial Commissioner may well prove correct, the resolution of this issue requires consideration of the intention of the Tribal Council in enacting MTC § 4-179 as applied to MTGA employees who have suffered compensable injuries under both State law and The Mohegan Workers Compensation Act:
Sec. 4-179.—Applicable Common Law.
The common law of the State of Connecticut interpreting provisions of State workers’ compensation law that are identical in substance to the provisions contained in this Article is hereby adopted as and declared to be the common law under this Article for application by the Mohegan Tribal Workers’ Compensation Commission and The Mohegan Court, where it does not conflict with Mohegan Law.
It should be noted that the Trial Commissioner’s Articulation does not reject the Pizzuto holding; narrowly construed, the Articulation concludes that identical benefits paid under MTC § 4-232’s State law counterpart must be ignored in determining eligibility for post-specific benefits. That the Tribal Council so intended to limit the benefit eligibility of MTGA employees, based on a change from the State workers compensation system to that of The Mohegan Tribe, is not at all clear, especially in light of the mandate of MTC § 4-179 as applied in a case, such as this, where both injuries arose out of the employment of Claimant by the Respondent. The Trial Commissioner’s Articulation does not address the application of Pizzuto to a case where benefits for both injuries were paid under MTC § 4-232.
However, at this point the issue is a possible limitation of Claimant’s eligibility for discretionary benefits not yet considered or awarded by the Trial Commissioner. As a general matter, future post-specific benefits are not susceptible to computation, and it has yet to be determined whether the Trial Commissioner’s prospective limitation would have any impact in this case. As described by the Connecticut Supreme Court, quoting the Compensation Review Board:
However, a commissioner cannot be sure that a claimant will or will not merit § 31-308a benefits in the future, as that issue is not yet before him. By definition, his future condition is. unknown, *260 and a commissioner is only empowered to decide how much compensation is appropriate given the condition of the claimant at the time of the proceedings.
Pizzuto, supra, 283 Conn, at 272, 927 A.2d 811, quoting Pern v. Mitchell Motors, 3259 CRB-6-96-1 (June 24, 1997).
The Trial Commissioner’s Finding of Award in Part/Dismissal in Part dated August 9, 2012, paragraph (h), is remanded to the Commissioner for determination, at the appropriate time, of Claimant’s eligibility for discretionary post-specific benefits pursuant to MTC 4-233.[27]
D
SANCTIONS
Claimant has respectfully argued that the Trial Commissioner improperly failed to impose attorneys fees for Respondent’s unreasonable contest of Claimant’s entitlement to benefits. In his brief, Claimant points to Respondent’s arguments surrounding the issue of the laparo-scopic gastric band surgery.[28] The Trial Commissioner declined to award attorneys fees on grounds that he did find merit to some of Respondent employer’s contest and thus the parties were entitled to litigate their issues through the Formal Hearing process.
With respect to such sanctions, the Compensation Review Board has noted the unconventional status of such an imposition:
The issue of unreasonable contest occupies an unconventional status in comparison to core claims for disability benefits and medical treatment, in the sense that a trial commissioner cannot determine whether grounds for such a finding exist until after the respondents have finished presenting their defenses. Where it seems likely either prior to the commencement of formal hearings or during trial that there will be justification for such a finding, a claimant should vocalize a request for § 31-300 sanctions as soon as possible. However, advance notice that unreasonable contest will be an issue is not always practical.
Whether or not a respondent is guilty of unreasonably contesting liability is a factual question to be determined after the trier has listened to the parties’ arguments and reviewed the evidence. Colon v, CEI Bottling & Distribution Co., 4470 CRB-3-01-12 (Nov. 12, 2002); Strona v. Textron Lycoming Div., 4398 CRB-4-01-5 (Aug. 6, 2002).
Kenneth Blaha, Claimant-Appellee v. Logistec Connecticut, Inc., Employer and Lamorte and Bums & Co. Insurer, Case No. 4544 CRB-3-02-6, 2003 WL 21633080 (July 9, 2003).
In the instant case, the Trial Commissioner’s Finding that the Respondent did prevail on portions of its contesting Claimant’s entitlement to benefits, at least as regards the compensability of the laparo-scopic gastric band surgery, is supported by the evidence.
*261 The Trial Commissioner’s Award (i) denying attorney’s fees is affirmed,

. The references to Claimant’s weight are included in this opinion solely because this factor plays a preeminent role in the arguments before the Trial Commissioner and this Court, and would not have been relevant otherwise.

. The actual wording of the rating was as follows;
"... I would issue Mr. Burnett a 27% impairment of the lumbar spine, (emphasis in original). This should be apportioned 15% due to a pre-existing condition (prior lumbar discec-tomy, and 12% due to the work related injury that occurred in May of 2005.” (sic, parenthesis not closed in original).
Claimant's Exhibit A.2.ff.

. An extraforaminal discectomy is a much smaller procedure than doing a fusion. See deposition testimony of Dr. Halperin at fn.6.

. See Record at 42; Office Notes of Norwich Orthopaedic Group, P,C. 10/29/2008. Dr. Halperin's note is actually quite emphatic on the subject of weight loss:
We did discuss surgery in the office today. I explained that I would be hesitant to *248 recommend surgery unless he absolutely could not live with his pain. He states that this is the case already. Therefore, if we are going to consider any surgery, I would once again make a plea to him to try to lose more weight ...

Id., (emphasis added).

. Respondent’s filings of Form M 36s are nothing if not unrelenting. In correspon *249 dence from Dr. Halperin to the Trial Commissioner dated August 25, 2010, Dr. Halperin explained:
I have been delaying booking Mr. Burnett for surgery because he has been attempting to lose weight. Certainly the more weight that he can lose, the more feasible surgery can be. It also should be noted that although I think that some benefit can be gained from an L3~4 and L4-5 fusion, this is not likely to be a curative procedure. He will in all likelihood still have issues with his lower back, even after a successful surgical procedure.
Record at 41.
On September 21, 2010 Respondent filed a Form M 36 on grounds that any further medical treatment would be palliative and not curative, an obvious (and presumably intentional) misreading of what Dr. Halperin was trying to say. The Trial Commissioner denied the Form M 36.

. At his first deposition, Dr. Halperin testified as follows:
Q. Is it possible for him to still have the surgery and receive some benefit even if he didn't lose weight?
A. It’s possible. But he’s—were not talking about—when he had is first discecto-my it was just a simple procedure, but now we’re getting into more involved surgery', And it’s really advisable that he lose weight because technically it becomes harder and he’s at a higher risk of complication and problems if he doesn’t lose weight.
Q. Now, you said it becomes harder. You mean the surgery becomes harder to do?
A. Technically, yeah. It’s more difficult It takes longer.
Q. And what will this next surgery' correct what do you hope it will correct? Or how will he be better?
A. Well, I’ve never really made an exact surgical plan with him. I’ve been kind of dragging my feet a little bit admittedly and kind of hoping that, you know, after his lap band surgery perhaps maybe he’ll feel a little bit better. Maybe, maybe not,...
Deposition of Dr, Michael Halperin, November 18, 2009 at 28-29. During the continuation of his deposition on January 29, 2010, at which Dr. Halperin never ordered the Claimant to lose weight before he would perform surgery, Dr. Halperin draws a distinction between performing an extraforaminal discecto-my and a fusion:
Q. Well, it is important because the respondent has been paying for two years waiting for him to lose weight: and he has represented that it was your suggestion that he could not have surgery until he lost weight, and today you're telling me that you would have done it even without the weight loss. Am I correct in that?
A. The extraforaminal discectomy at that time, but that’s a much smaller procedure than doing a fusion; so at that point, whatever the date that was—I forget when it was that I had mentioned that to him. I think it was in 2008.
Q. Okay, Well, I guess the thing I’m trying to get you to be very, very dear and definite on is whether or not—you've already said you did not tell him to lose weight and that you wouldn’t tell him to lose weight. Correct?
A. No. I wouldn't tell him how to lose weight. I would certainly tell patients to lose weight. I do that all the time if I’m thinking about doing surgery.

. Interestingly, the Return portion of the note states: 2 months with the patient being reweighed in this office. Indeed, it appears that subsequent to the February 11, 2010 office visit, Claimant's weight loss efforts once again started to show results.

. Notes from Connecticut Surgical Group post gastric band surgery indicate both that [u]pon review of the patient’s diet, the patient is making some questionable choices as well as [t]he patient does indicate no ability to exercise secondary to an increase in pain from a pre-existing work-related injury. Record at 25, Notes from Connecticut Surgical Group, P.C. Jan. 19, 2010. Between November 4, 2009 and February 11, 2010 office visit with Dr. Halperin, Claimant's weight remained essentially constant, going from 331 pounds to 330 pounds.

.Transforaminal Lumbar Interbody Fusion/Instrumented Posterolateral Spinal Fusion.

. Claimant had not yet been rated following the January 2, 2011 fusions): presumably, as of this date the rating has been, performed.

. It appears that the 12% impairment previously ascribed by Dr. Halperin to this injury had already been paid.

. The Constitutional power of the Gaming Disputes Court to receive evidence and adjudicate controversy de novo set forth in Article XIII Section 2.1 of the Constitution of The Mohegan Tribe of Indians of Connecticut, is used sparingly. See Belisle v. Office of the Director of Regulation, 3 G.D.R. 49, n. 11, 7 Am. Tribal Law 387 (2007).

. Section 31-308-8 sets forth the any evidence standard for review of a Commissioner’s findings:
Ordinarily, appeals are heard by the compensation review division upon the certified copy of the record filed by the commissioner. In such cases the division will not retry the facts or hear evidence. It considers no evidence other than that certified to it by the commissioner, and then for the limited purpose of determining whether the finding should be corrected, or whether there was any evidence to support in law the conclusion reached. It cannot review the conclusions of the commissioner when these depend upon the weight of the evidence and the credibility of witnesses. Its power in the corrections of the finding of the commissioner is analogous to, and its method of correcting the finding similar to the power and method of the Supreme Court in correcting the findings of the trial court.

. See CONNECTICUT WORKERS' COMPENSATION AFTER REFORMS, CENTENNIAL ED., at 904.

. Finding (T).

. Dr. Sella also found Claimant at that time to have a light duty type of work capacity, with limitations on bending, pushing, pulling and lifting. Id.

. In fact, the medical record and deposition testimony is so extensive that a conclusion either way would find substantial evidentiary support.

. See Dr. Halperin's office notes from 04/09/2010, which include the statement:
Once again we discussed treatment options. My suggestion to William is to hold off on any surgical considerations. His current weight is 318 lbs. and he is 6'1, putting him at a body mass index of 42. Any surgery would be very difficult to accomplish on Mr. Burnett, and he would certainly be at a high risk because of his size and history of previous surgery.

.Finding (U).

. It is not clear why the Trial Commissioner did not use Claimant’s weight at the time of the laparoscopic gastric band surgery, 363 pounds, for comparison.

. Dr. Halperin also testified that he doubted the Claimant was too big to operate on. id, at 64.

. Indeed, Dr. Halperin went on to testify:
Q. My question was whether or not you would concur that it was medically appropriate for him to lose weight because of the problems in his spine and the proposed surgery?
A. Well, it would definitely make surgery easier, safer, and also technically— you could probably do technically a better job if he’s thinner.
Transcript at 61.

. Prior to the performance of the laparo-scopic band procedure Claimant had been receiving temporary partial disability benefits under MTC § 4-232. There is no doubt that the statutory requirement that (t]he employee is ready and willing to perform other work in the same locality, MTC § 4-232(a)(2), was
temporarily interrupted by this surgery, but the record is devoid of any evidence as to its duration or severity. On June 22, 2009, eleven days after the surgery, Dr. Papasavas wrote that Claimant’s hospitalization for the gastric band surgery was uneventful and he was discharged the next day, As of that date he was recovering well following laparoscopic placement of adjustable gastric band and was being maintained on liquid Dilaudid for pain control, which he found much better in regulating his chronic back pain compared to Vi-codin. There is no mention of whether pain control was also required for his recent gastric surgery, and the Court’s review of the extensive record has not revealed any medical documentation as to the period of time for which Claimant would have been ineligible for temporary partial disability benefits as a result of disability due to the gastric band surgery.

,See Record, at 42, Office notes of Norwich Orthopedic Group, P.C. 02/11/2010.

. Q. So if Dr. Sella had made the statement that he could actually lose enough weight to where he wouldn’t have any back pain at all, would you agree or disagree with that statement?
A. Anything is possible. 1 don’t think it’s likely though.
Transcript of Deposition of Dr. Michael Halperin, November 18, 2009 at 31.

. Award Paragraph (U). In the understated words of Dr. Halperin, (addressing the some-
what different issue of age as a factor in weight gain):
A. I don’t think you can draw any conclusions from that, and he’s older. His metabolism is less.
He's also a Workers' Comp patient which means that—well, we could have a long talk about that.
Q. Understood.
Transcript of Continued Deposition of Dr. Michael Halperin, January 26, 2010 at 62.

. It should be emphasized that, if the prospective limitation on MTC § 4-233 benefits becomes an issue, the Trial Commissioner may well follow his earlier holding,

. The Commissioner also found that Respondent violated his Order granting temporary partial disability benefits with work searches commencing October 25, 2010, Finding V, and imposed interest pursuant to MTC § 4-206 at the rate of 10% for all disability payments after August 25, 2010. It is the Court's view that Respondent, having failed, neglected and/or refused to comply with said Order arguably merited much harsher sanctions, but the Court will yield to the discretion of the Trial Commissioner on the issue of arguably contemptuous refusal to comply with his orders.